**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FARM CREDIT LEASING SERVICES CORPORATION,** | : : : | **JURY TRIAL DEMANDED** |
| **Plaintiff,** | : : | |
| **vs.** | : : | **Civil Action No.:** |
| **CIT GROUP/EQUIPMENT FINANCING, INC., KRONES, INC., HEINZ SOMMER, KRONES AG, VOLKER KRONSEDER, THE MARSHALL GROUP, MARSHALL BANKFIRST CORP., MARSHALL FINANCIAL, INC., and MARSHALL INVESTMENTS CORP.,** | : : : : : : : : : : : | |
| **Defendants.** | : : | |

**COMPLAINT**

Plaintiff Farm Credit Leasing Services Corporation ("FCL"), for its Complaint against

defendants CIT Group/Equipment Financing, Inc., Krones, Inc., Heinz Sommer, Krones AG,

Volker Kronseder, The Marshall Group, Marshall BankFirst Corp., Marshall Financial, Inc., and

Marshall Investments Corp., (collectively, at times, referred to as "Defendants" or "All

Defendants") alleges as follows:

**INTRODUCTION**

1.     This lawsuit arises from fraudulent misrepresentations and material omissions that

Defendants made in connection with their solicitation and inducement of FCL to participate in a

grossly overvalued $145 million industrial equipment lease (the "Lease") with a now-defunct

beverage company known as Le-Nature's, Inc. ("Le-Nature's").  FCL was a $50 million dollar

participant in the Lease financing and a victim of the fraud and conspiracies to defraud perpetrated by the Defendants.

2.     Before FCL closed on its participation in the Lease, both CIT and the Marshall Defendants, who were responsible for administrating and marketing the Lease financing to potential participants, received a tip from an informant who advised that Le Nature's had conspired with the Krones Defendants, who manufactured and sold the equipment, to misrepresent that the leased equipment would cost $184 million when the actual price was only $91 million.

3.     CIT and the Marshall Defendants investigated -- and ultimately confirmed -- the informant's claims.  Nonetheless, they proceeded with the sale of participation interests in the Lease financing, despite knowing that the purchase price was inflated and fraudulent, so that they could divest themselves of the risk in the Lease at the expense of the investors they were soliciting, including FCL.

4.     In doing so, CIT and the Marshall Defendants intentionally concealed from FCL not only the inflated and fraudulent purchase price for the equipment, but also the tip that they had received concerning the inflated and fraudulent purchase price and their investigation confirming the accuracy of that information.

5.     FCL never would have purchased a participation interest in the Le Nature's Lease had it been told of the tip, as the tip would have changed FCL's risk assessment of the transaction.

6.     After closing on the sale of a participation interest to FCL, CIT and the Marshall Defendants continued to cover up their fraud and the risks of the Le Nature's Lease by

misrepresenting and concealing information from FCL so that FCL would be unable to discover the fraud and the financial losses it was incurring.

7.      The Defendants were largely successful with their scheme until Le-Nature's unsecured creditors forced the company into involuntary bankruptcy on November 1, 2006.  It was only after Le-Nature's bankruptcy, in which the leased equipment was sold for pennies on the dollar, that FCL learned it had been defrauded by the Defendants' conspiracies to misrepresent the value of the Equipment and conceal those misrepresentations with additional lies and fraudulent conduct.

8.      As a direct result of this fraudulent conduct, FCL has lost a substantial portion of its $50 million investment, and through this action seeks to recover these losses.

## THE PARTIES

9.      Plaintiff FCL is a federally chartered corporation, chartered under 12 U.S.C. § 2211, with its principal place of business located in Minneapolis, Minnesota. Pursuant to 12 U.S.C. § 2258, FCL is deemed to be a citizen of the state where its principal place of business is located.

10.      Defendant CIT Group/Equipment Financing, Inc. ("CIT") is a Delaware corporation with its principal place of business in Livingston, New Jersey.  CIT holds itself out as an industry leader in providing structured equipment financing and leasing solutions.  At all times relevant to this litigation, CIT was doing business in this judicial District.

11.      Defendant Krones, Inc. ("Krones") is a Wisconsin corporation with its principal place of business in Franklin, Wisconsin.  Krones is a wholly-owned subsidiary of Defendant Krones Aktiengesellschaft ("Krones AG"), and exclusively markets, sells and installs Krones AG products and services in the United States.  Krones shares certain officers and directors with

Krones AG. ("Krones" and "Krones AG" are, at times, collectively referred to as the "Krones Defendants").

12.     Defendant Heinz Sommer ("Sommer") is a resident of Pennsylvania and the former President of Krones.  At all times relevant to this Complaint, Sommer conducted business in the Western District of Pennsylvania, as well as throughout the United States.

13.     Defendant Krones AG is a German corporation with its principal offices in Neutraubling, Germany.  Krones AG touts itself as a world leader in the manufacturing of packaging and bottling-line systems, beer brew-house systems, IT solutions and warehouse-logistics systems.  Krones AG and its U.S. subsidiary, Krones, manufactured, sold and installed the bottling equipment ("Equipment") to Le-Nature's.  According to its marketing materials, Krones AG has facilities strategically located around the globe to sell its products, including twelve in the United States.  Upon information and belief, Krones AG has employees that reside and do business in this judicial District.  Krones AG has also entered into agreements with businesses located in the Western District of Pennsylvania, including Le-Nature's.

14.     Defendant Volker Kronseder ("Kronseder") is the current President of Krones and, upon information and belief, a citizen and resident of Germany.  At all times relevant to this Complaint, Kronseder was the Chairman and Chief Executive Officer of Krones AG.  Kronseder, through Krones and Krones AG, regularly conducted business in the United States, including within this judicial District.  Kronseder oversaw Krones' operations in the United States, negotiated contracts, attended industry trade shows and participated in other marketing activities on behalf of Krones and Krones AG.

15.     Defendant The Marshall Group ("Marshall Group") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  The Marshall Group holds itself

out as a trustworthy and knowledgeable firm specializing in the placement and servicing of commercial loans to lenders nationwide.  The Marshall Group was founded in September 2001 and purports to have placed more than $2.5 billion in financing for more than 200 borrowers.

16.     Defendant Marshall BankFirst Corp. ("Marshall BankFirst") is a $600 million bank holding company that was organized under the laws of Minnesota and has its principal place of business in Minneapolis, Minnesota.  Marshall BankFirst, through its affiliate, the Marshall Group, provides loan participation and syndication opportunities to an extensive network of commercial banks and financial institutions throughout the United States.

17.     Defendant Marshall Financial, Inc. ("Marshall Financial") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota, and is an affiliate of the Marshall Group.  Marshall Financial was responsible for directing and managing the marketing of the financing of the Lease, including running the order book.  Marshall Financial entered into the initial transaction with Le-Nature's and then immediately transferred its interest to CIT.

18.     Defendant Marshall Investments Corp. ("Marshall Investments") is a Delaware corporation and an affiliate of the Marshall Group.  Marshall Investments, upon acceptance of additional commitments to the financing, was a co-lessor via a pro-rata assignment of the lessor's interest in the transaction on behalf of the participating lessors.  In short, Marshall Investments purchased a participation interest in the Le-Nature's lease from CIT and then resold its interest to others.

19.     At all relevant times, the Marshall Group, Marshall BankFirst, Marshall Financial and Marshall Investments (collectively, the "Marshall Defendants") acted as a single entity through shared officers and employees, as well as intermingled funds.  The letterheads of the

various Marshall Defendants were used interchangeably throughout FCL's dealings with the Marshall Defendants.  For example, the Offering Memorandum for the Lease (as defined in paragraph 42, below) features the Marshall Group's logo on its cover page, lists Marshall Financing as the "Co-Arranger and Syndication Agent," and identifies Marshall Investments as the "Co-Lessor."

## JURISDICTION AND VENUE

20.     The Western District of Pennsylvania has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because one or more of the claims alleged herein arise under the laws of the United States.  The Western District of Pennsylvania has supplemental jurisdiction over the remainder of the claims asserted herein pursuant to 28 U.S.C. § 1367, as the claims are so related to the claims over which the Western District of Pennsylvania has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

21.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Pennsylvania where Le-Nature's was headquartered.

## FACTUAL BACKGROUND

**A.     Le-Nature's And The Krones Defendants Knew From The Very Beginning
That The Equipment Only Cost Approximately $91 Million**

22.     Le-Nature's, a Delaware corporation headquartered in Latrobe, Pennsylvania, was in the business of developing, producing and marketing non-carbonated beverages under the Le-Nature's brand name.

23.     In early 2004, Le-Nature's began constructing a new $250 million, four-line bottling plant in Phoenix, Arizona ("Phoenix Facility") for which Le-Nature's sought equipment financing of approximately $184 million.

24.     Le-Nature's entered into negotiations with Krones AG, through Krones, to obtain the bottling Equipment for which Le-Nature's sought the financing.

25.     At all relevant times, both Krones and Krones AG, through their respective and shared personnel, were involved in and responsible for the design, marketing, manufacturing, and installation of the Equipment for the Phoenix Facility.

26.     As part of these efforts, Le-Nature's and the Krones Defendants were in regular and direct contact about the Equipment and its installation.  This communication included, but was not limited to, e-mails between Le-Nature's employees and Rainulf Diepold, Stefan Kindermann, Andreas Mueller, Petra Fogler, and at least 30 other employees of the Krones Defendants.

27.     Well before Le-Nature's and Krones finalized their negotiations and entered into a formal agreement for the manufacture and installation of the Equipment, both Le-Nature's and the Krones Defendants knew that it would cost approximately $91 million to manufacture and install the Equipment at the Phoenix Facility.

28.     In May 2004, Heinz Sommer, the President of Krones, sent an Equipment Purchase Agreement to Jonathan Podlucky, the Chief Operations Officer of Le-Nature's, via the wires or United States mail, stating that the Equipment was for installation in a new Le-Nature's facility "in either Las Vegas, NV or Phoenix, AZ," and that the purchase price of the Equipment was $91,077,095.

29.     Shortly thereafter, in July 2004, Roderick Daly of Krones sent a document to Jonathan Podlucky of Le-Nature's, via the wires or United States mail, showing that the total purchase price of the Equipment would be $91,347,833.

30.     Ultimately, on August 27, 2004, Le-Nature's entered into a Project Management Agreement ("PMA") with Krones pursuant to which the Krones Defendants agreed to manufacture and install the Equipment at the Phoenix Facility for $91,347,833.

**B.      CIT Ignores Obvious Red Flags And A Direct Warning**

31.     Prior to executing the PMA with Krones, Le-Nature's approached various lender institutions with whom it had a previous relationship, including CIT and the Marshall Defendants, to arrange financing for the four lines of Equipment to be installed at the Phoenix Facility.

32.     Despite knowing that the purchase and installation cost of the Equipment would be approximately $91 million, Le-Nature's represented to the potential lenders that the Equipment would cost roughly $184 million, more than two times its actual value.  Le-Nature's further told the potential lenders that the Equipment would be the only collateral securing the financing.

33.     In early 2004, CIT partnered with Varilease, Inc. ("Varilease") to finance the purchase of the Equipment for the Phoenix Facility.

34.     Varilease withdrew from the proposed financing arrangement, however, because Le-Nature's would not let Varilease see the purchase order(s) for the Equipment, and would not allow Varilease to have any communication with the Krones Defendants.  Varilease's inability to confirm even the most basic information about the Equipment it was proposing to finance, at the

hands of Le-Nature's, raised enough of a red flag with Varilease that it was no longer willing to participate in the financing.

35.     Varilease told CIT the reasons why it was withdrawing from the proposed financing arrangement, and, upon information and belief, advised CIT that it should abandon the financing as well.  In addition, Varilease specifically requested that CIT tell the lenders they were soliciting for investments that Varilease was voluntarily withdrawing from the proposed financing due to Le-Nature's actions in denying access to Krones and the documents underlying the financing, and not because Varilease was unable to handle the transaction.

36.     CIT disregarded Varilease's request to warn other lenders about the documentation issues and Le-Nature's actions, and instead affirmatively represented to FCL and other solicited participating lenders that Le-Nature's had terminated Varilease's involvement with the proposed financing due to concerns about Varilease's financial stability and ability to administer the transaction.

37.     CIT made these affirmative misrepresentations about Varilease and its withdrawal from the proposed financing to prevent potential participating investors in the financing, including FCL, from seeing or investigating any questionable conduct by Le-Nature's and the Krones Defendants.  In doing so, CIT intentionally concealed the risks of participating in the equipment financing from potential and actual participating lenders in the Equipment financing, including FCL.

**C.     CIT Finds A Willing Partner In The Marshall Defendants
        To Press Forward With Financing The Equipment**

38.     Varilease's withdrawal from the proposed financing, and CIT's knowledge of the reasons therefore, did not deter CIT from continuing its efforts to arrange funding for the purchase of the Equipment.  Indeed, after Varilease's unceremonious exodus from the

transaction, CIT partnered with the Marshall Defendants to secure the $145 million that Le-Nature's sought to finance the Equipment.

39.     In dealing with CIT and the Marshall Group, however, Le-Nature's apparently learned from its mistakes with Varilease.  On August 27, 2004, the same day that Le-Nature's executed the PMA with Krones, Le-Nature's provided CIT and the Marshall Defendants with a copy of the PMA.  Unfortunately, Le-Nature's did not provide CIT and the Marshall Defendants with the real PMA.  Instead, Le-Nature's gave CIT and the Marshall Defendants a doctored version of the PMA that listed the total Equipment cost as the approximately $184 million for which Le-Nature's sought financing, and not the actual approximately $91 million cost that was listed in the real PMA.

40.     At the time Le-Nature's provided CIT and the Marshall Defendants with the doctored PMA, both Le-Nature's and the Krones Defendants knew that the total cost of the Equipment was approximately $91 million (as set forth in the real PMA) and not the approximately $184 million set forth in the doctored PMA.

41.     Ultimately, in January 2005, CIT and the Marshall Defendants agreed to secure financing for the purchase of the Equipment.  Pursuant to this agreement, CIT and the Marshall Defendants would finance the purchase of three of the four bottling lines from the Krones Defendants for $145 million, and then lease the Equipment to Le-Nature's.  Le-Nature's, in turn, agreed to assign certain of its rights and interests under the PMA to CIT and the Marshall Defendants.

42.     Summarily stated, CIT and the Marshall Defendants structured their agreement to finance the purchase of the Equipment as follows:  (a) CIT and the Marshall Defendants would secure the funds necessary to purchase the three lines of bottling Equipment from Krones for

$145 million; (b) Marshall Financial would enter into a Master Lease Agreement with Le-Nature's (the "Lease"), dated April 15, 2005, to lease the Equipment to Le-Nature's; (c) Marshall Financial would assign the Lease to CIT so that CIT could act as the administrator of the Lease responsible for billing and collecting amounts due from Le-Nature's and remitting *pro rata* shares of the Lease payments to the participating lenders/lessors; (d) CIT would assign and sell a $30.5 million participation interest in the Lease to Marshall Investments; (e) Marshall Investments would sell 100% of those participation interests to other participants; and (f) CIT would sell the remaining portion of its interest in the Lease to other participants, including FCL.

43.     The Marshall Defendants conditioned their participation in the financing upon their syndication of 100% of the financing that they were charged to contribute.

44.     CIT and the Marshall Defendants further conditioned their commitment to provide the financing upon, among other things: (1) their not becoming aware of any materially negative information or information that was inconsistent with what Le-Nature's had previously disclosed; and (2) their satisfactory completion of business, accounting, financial and legal due diligence of both the transaction and Le-Nature's.

45.     At the time CIT and the Marshall Defendants agreed to secure the $145 million in financing, Le-Nature's and the Krones Defendants knew that all four of the bottling lines cost only approximately $91 million.

**D.     CIT Learns Of The Fraudulent Conduct By Le-Nature's And The Krones Defendants But Fails To Disclose Either The Fraud Or CIT's Investigation To FCL**

46.     Shortly after CIT and the Marshall Defendants agreed to secure the Equipment financing, an informant (the "Whistleblower") who had access to Krones' internal documents and information regarding the Le-Nature's Transaction (including pricing, deposits, and the type of

Equipment delivered) contacted both CIT and the Marshall Defendants and told them that Le-Nature's and the Krones Defendants were over-financing the Equipment.

47.     Specifically, on or about March 16, 2005, both Roy Keller, President of CIT, and Scott Anderson, President of The Marshall Group, received separate telephone calls from the Whistleblower, who explained that all four lines of the bottling Equipment cost $91 million, which was less than half of the $184 million purchase price represented by Le-Nature's. This information was materially negative and was inconsistent with information previously disclosed by Le-Nature's and the Krones Defendants to CIT and the Marshall Defendants, and in turn by CIT and the Marshall Defendants to FCL and others.

48.     Over the course of the next several weeks, CIT and the Marshall Defendants apparently investigated the Whistleblower's claims. At CIT's request, the Whistleblower faxed CIT a two-page spreadsheet identifying the Equipment for one of the bottling lines. For each piece of equipment, the spreadsheet identified the configured list price, discounts and selling price to Le-Nature's. CIT and the Marshall Defendants compared the information on the spreadsheet with the pricing information provided by Le-Nature's and the Krones Defendants for the Equipment. The comparison made clear that the Equipment was being drastically over financed.

49.     Thereafter, as CIT has alleged in separate litigation against the Krones Defendants:

(a)     On or about March 17, 2005, CIT's Tom Magrath ("Mr. Magrath") called Mr. Sommer, then-President of Krones, to follow up on the Whistleblower's allegations. Mr. Magrath told Mr. Sommer that CIT was performing an interim funding audit and needed his help reconciling the purchase price for the Equipment;

(b)    The next day, on or about March 18, 2005, several CIT employees, at Mr. Magrath's direction, held separate private meetings at CIT's Tempe, Arizona office with Le-Nature's Chief Executive Officer, Gregory Podlucky ("Mr. Podlucky") and Mr. Sommer;

(c)    At the March 18, 2005 meeting with Mr. Podlucky, CIT confronted Mr. Podlucky with the apparent over financing. Mr. Podlucky denied the allegation and pledged to assemble the appropriate people at Le-Nature's and Krones to compile for CIT an itemized list of the actual installed cost. Mr. Podlucky told Mr. Magrath he would have the list to him by Tuesday, March 22, 2005;

(d)    At the March 18, 2005 meeting with Mr. Sommer, CIT confronted Mr. Sommer with the apparent over financing. Mr. Sommer attempted to explain the discrepancy by suggesting that $91 million figure did not represent the total cost of the project. Among other explanations, Mr. Sommer suggested that the project required the PMA to include "soft costs" such as engineering, design, and installation;

(e)    CIT showed Mr. Sommer the spreadsheet obtained from the Whistleblower and demanded an explanation. Mr. Sommer initially stated that the Equipment configuration reflected on the spreadsheet was for a different bottling plant that would have used smaller models of the same Equipment and a different configuration. Mr. Sommer also represented that the information on the spreadsheet was unrelated to the purchase price of the Equipment financed by CIT;

(f)    Also on March 18, 2005, Mr. Magrath sent a letter to Mr. Podlucky advising him of CIT's belief -- based on the Whistleblower's revelations -- that Le-Nature's was not in compliance with its financial covenants, that Le-Nature's had improperly used the millions

13

previously funded by CIT, and that Le-Nature's had given CIT materially misleading information;

(g)     On or about March 22, 2005, Mr. Podlucky faxed to Mr. Magrath a specification sheet signed by Le-Nature's and Krones identifying each piece of Equipment for production line 1.  The total cost was reflected as approximately $46.1 million;

(h)     On or about March 24, 2005, Mr. Magrath confronted Mr. Podlucky with the spreadsheet, which he faxed to Le-Nature's and asked him to explain.  Within minutes, Mr. Podlucky called Mr. Magrath and denied any prior knowledge about the spreadsheet.  Like Mr. Sommer before him, Mr. Podlucky claimed that the document referred to a previously-proposed facility in Las Vegas and that the prices reflected on the spreadsheet were unrelated to the Equipment financed by CIT;

(i)     Also on or about March 24, 2005, the Chief Executive Officer of Krones AG, Rainulf Diepold, told Mr. Magrath via telephone that Krones AG shipped over $100 million of Equipment to the United States for installation at the Phoenix Facility and invoiced that same amount.  Citing a confidentiality agreement, the CEO of Krones AG then refused to give Mr. Magrath any further information to help his investigation and told Mr. Magrath that he would have to speak with Mr. Sommer to confirm the purchase price being charged to Le-Nature's.

(j)     CIT's Mr. Magrath then called Mr. Sommer.  During this conversation, on March 24, 2005, Mr. Sommer stated that: (1) the total purchase price for the Equipment was approximately $185 million; (2) CIT's purchase price included a mark-up over the amount Krones AG charged Krones; and (3) for the first time, detailed specification sheets had been prepared and would be forthcoming.

14

(k)      On or about March 28, 2005, Mr. Podlucky faxed to CIT detailed

specification sheets for all four bottling lines.  Each piece of Equipment was identified by

production line with the corresponding purchase price.  The specification sheets were signed by

Mr. Podlucky and, on CIT's information and belief, by Rainulf Diepold.  The purchase price

reflected on the specification sheets were consistent with the purchase price reflected in the

PMA.

50.      As FCL subsequently learned, this was not the first time that the Whistleblower

had warned those involved with the transaction about the fraud that Le-Nature's and the Krones

Defendants were perpetrating.  As early as June 2004, the Whistleblower e-mailed internal

Krones documents to the Krones Defendants showing that: (1) Le-Nature's was obtaining

approximately $184 million of financing for Equipment that the Krones Defendants only charged

Le-Nature's approximately $91 million; and (2) the Krones Defendants were representing that

they held $80 million in deposits from Le-Nature's for the Equipment when in fact there were no

such deposits.

51.      Upon information and belief, any doubts within Krones and Krones AG about the

Whistleblower's accusations were put to rest in November 2004, when Mr. Kronseder was told,

directly and in person, that Le-Nature's was in fact securing $184 million in financing for

Equipment that had only cost $91 million.

52.      Notwithstanding these warnings about the fraudulent nature of the Le-Nature's

transaction, which were inherently credible to the Krones Defendants because they were based

upon the Krones Defendants' own internal documents, Messrs. Sommer and Kronseder worked

hand-in-hand with Mr. Podlucky of Le-Nature's to advance the fraud by fabricating equipment

schedules and showing fraudulently-inflated prices, while at the same time manufacturing

excuses for why the financing appeared greater than the true costs of the Equipment.

53.     Despite the opportunity to do so, the Krones Defendants did not warn potential

investors about Le-Nature's fraudulent activities.  Instead, they aided and abetted Le-Nature's

continuing fraud and made plans with Le-Nature's to perpetrate at least three additional frauds

through similar plots to over-finance equipment in plants around the United States.  These plans

never came to fruition because, as discussed below, Le-Nature's collapsed first.

**E.      CIT And The Marshall Defendants Save Themselves
         From Le-Nature's Fraud By Defrauding Other Investors**

54.     The information revealed by the Whistleblower, and the investigation that

followed, gave CIT and the Marshall Defendants serious concerns about, if not actual knowledge

of, fraud in the Le-Nature's Lease transaction.  This was confirmed by a March 30, 2005 email

from Mr. Magrath to Mr. Keller stating that CIT strongly suspected (if it did not actually know)

that Le-Nature's had defrauded CIT and the Marshall Defendants with the help of the Krones

Defendants.

55.     CIT and the Marshall Defendants, however, were in a quandary.  By this time,

CIT had already advanced $39.2 million to Le-Nature's.  The Marshall Defendants, in turn, faced

losing substantial commissions.  Compounding these problems, CIT and the Marshall

Defendants still had not sold any participations in the Lease financing to other investors.  If Le-

Nature's' and the Krones Defendants' fraud became public, CIT and the Marshall Defendants

would be unable to pawn the financing off to other investors, and CIT's $39.2 million advance

would therefore be a total loss.

56.     Instead of doing the right thing and nipping Le-Nature's' and the Krones

Defendants' fraud in the bud, CIT and the Krones Defendants selfishly suppressed the knowledge

they had gained from the Whistleblower and their investigation so that they could continue with their plan to sell participations in the Lease to unsuspecting investors, including FCL. This would provide a double benefit to CIT and the Marshall Defendants, as it would both eliminate their risk in the financing and also earn them additional compensation in the form of commissions.

57.     CIT and the Marshall Defendants chose this course of action because they did not want the lenders to whom they were selling participating interests in the Lease, including FCL, to discover either the true, immitigable risks of the deal or CIT's and the Marshall Defendants' failure to perform competent, reliable and verifiable due diligence prior to agreeing to finance the Equipment.

58.     In taking these actions, CIT and the Marshall Defendants knowingly and intentionally became participants and co-conspirators in the fraudulent conduct of Le-Nature's and the Krones Defendants.

59.     From this point forward, CIT and the Marshall Defendants acted in their own self interests at the expense of the participating lenders, as demonstrated by their procuring from Le-Nature's a first position security interest in the line of Equipment being financed by other lenders. CIT and the Marshall Defendants sought this additional security because they knew the Equipment for which they were securing financing was over financed.

F.      **CIT And The Marshall Defendants Knowingly Pass On False And Misleading Information About The Cost Of The Equipment To Potential Investors**

60.     Despite their knowledge of fraud by Le-Nature's and the Krones Defendants in the underlying transaction, CIT and the Marshall Defendants continued with their plans to solicit financial institutions and other potential investors to purchase participation interests in the Le-Nature's Lease.

61.     To facilitate their sale of the participation interests, CIT and the Marshall

Defendants jointly prepared an Information Memorandum for distribution, via United States

mail, to the financial institutions and other entities that they solicited for participation in the

financing, including FCL.  CIT and the Marshall Defendants also arranged in person and

telephonic meetings with prospective participants, including FCL.

62.     In the Information Memorandum, CIT and the Marshall Defendants represented

that CIT had committed $46 million of its own funds to the Lease financing, about half of which

CIT had already advanced.  CIT and the Marshall Defendants also represented that they were

seeking $144 million in additional financing for Le-Nature's to be advanced over the ensuing six

months.

63.     According to the Information Memorandum, the anticipated cost of the

Equipment allocated by line was as follows:

|                     |               |
|---------------------|---------------|
| Line 1              | $46,003,281   |
| Line 2              | $45,157,011   |
| Line 3              | $57,180,405   |
| Line 4              | $41,585,655   |
| Total Original Cost | $189,926,352  |

**G.     CIT And The Marshall Defendants Mislead FCL
         Regarding The Risk Of Participating In The Equipment Financing**

64.     FCL was one of the financial institutions that CIT solicited for potential

participation in the Lease financing.  As part of its solicitation efforts, CIT sent FCL the

Information Memorandum.

65.     In addition to the Information Memorandum, CIT also directly provided FCL with

the following materials and information:

(a)     several years of historical financials and the "historical and projected

financial statements and selected analysis" purportedly based on those historical financials;

(b)      an analysis of the "risk-adjusted probability of default" with a conclusion that there was a low risk of default;

(c)      a representation that the current income of Le-Nature's would be almost double the Lease payments (a 1.89 coverage) even with no new additional revenue;

(d)      an explanation of the credit rating model and a rating of the Le-Nature's transaction as "good" under that credit rating model;

(e)      descriptions of Le-Nature's' market and a statement that "for the nine months ended September 30, 2004, 45% of [Le-Nature's'] sales were to accounts west of the Mississippi;"

(f)      representations that "[i]n early 2003, Le-Nature's began selling to various large retailers on the West Coast" and that "[t]his . . . business has grown rapidly to the point where sales west of Mississippi represented nearly 45% of overall sales for the nine months ended September 30, 2004, up from 30% in 2003;"

(h)      assurances that the development of a plant in "proximity to western markets" was due to the purported increase in sales on the West Coast and the cost of shipping from the East Coast production facility; and

(i)      a statement that the "expansion risk" into the Western market was "largely mitigated" by, among other things, the "existing [W]estern customer base."

66.      CIT further provided FCL with a preliminary analysis of the residual risk associated with the Equipment.  In this analysis, CIT and the Marshall Defendants estimated, among other things, that the liquidation value of the Equipment after one year of use would be over $113.4 million, and after two years would be more than $94 million.

67.     The foregoing representations were materially false and made by CIT and the Marshall Defendants with the express purpose and intent to induce FCL to enter into a Participation Agreement.  Indeed, at the time that CIT and the Marshall Defendants made the representations, CIT and the Marshall Defendants knew or had reason to know that the Equipment pricing was over-inflated and that the cost of the Equipment, when new, was less than the claimed liquidation value after years one and two.

68.     FCL reasonably relied on the Information Memorandum and the other representations made by CIT and the Marshall Defendants, including their representations regarding the detailed and thorough due diligence performed on the transaction and Le-Nature's. At the time, CIT was known as a highly-experienced financing company that was a veteran of equipment valuations, lease administration and contractual safeguards.

69.     FCL also reasonably relied upon the representations by CIT and the Marshall Defendants based upon the Marshall Defendants' representation to FCL that The Marshall Group were risking their own money by investing $60 - $80 million of its own capital in the same Lease that CIT and the Marshall Defendants were marketing to prospective participants, including FCL.

70.     Unbeknownst to FCL, this representation was false.  Indeed, neither CIT nor the Marshall Defendants told FCL that the Marshall Defendants were not investing *any* of their own money in the transaction, but rather were actually obtaining "sub" participants as part of a successful effort to syndicate 100% of their participation in the financing.

**H.      FCL Unwittingly Enters A Participation Agreement It Would Not Have Entered Into But For The Actions Of The Defendants**

71.      Without knowledge of the foregoing facts and fraudulent conduct, FCL entered into a Participation Agreement with CIT on April 15, 2005.  FCL wired a total of $50 million to CIT to purchase a participation interest in the Lease.

72.      FCL did not know about the Whistleblower's allegations or CIT's investigation of those allegations prior to purchasing the participation interest in the Lease.

73.      The Whistleblower's allegations and the facts supporting them were material and materially negative information that CIT and the Marshall Defendants actively suppressed from FCL.  Had FCL known these facts, and been afforded the opportunity to conduct its own investigation, FCL would not have purchased the participation interest in the Lease.

74.      FCL reasonably placed heavy reliance upon and trust in CIT and the Marshall Defendants due to their reputations in the industry and superior knowledge of Le-Nature's, the Krones Defendants and the Equipment.  FCL necessarily relied on the flow of information disseminated by CIT and the Marshall Defendants, and the absence of any troubling information about Le-Nature's and the Equipment Lease transaction, in deciding to purchase a participation interest in the Lease.

75.      Under the terms of the Participation Agreement, FCL was entitled to prompt written notice of the occurrence of any event of default under the Lease that CIT received.  CIT also agreed that it would not consent to a reduction, waiver or release of any of Le-Nature's payment obligations under the Lease, including but not limited to extending the time of payment of any of Le-Nature's obligations to make payments under the Lease

76.      At the time that FCL entered into the Participation Agreement with CIT, CIT and the Marshall Defendants represented and warranted that they had no actual knowledge that any

21

default had occurred under the Lease.  CIT and the Marshall Defendants also warranted that they would exercise the same duty of care in its administration of the Lease as they would normally exercise in managing their own affairs.

77.     Unbeknownst to FCL, all of these representations were knowingly false at the time CIT and the Marshall Defendants made them to FCL.

**I.     CIT Attempts To Cover Up Its Fraud and Participates In A Kickback Scheme To Divert Purchase Price Proceeds To Le-Nature's**

78.     In June 2005, after FCL had funded its participation commitment, CIT and the Marshall Defendants received an appraisal indicating that the Equipment's fair market value was only $80.45 million -- less than half of the total amount financed.  CIT and the Marshall Defendants also learned that contrary to previous representations, the Equipment would have an orderly liquidation value of only $15 million after five years.  Finally, the appraisal estimated the useful life of the Equipment at only 9.5 years.

79.     The appraisal confirmed what the Whistleblower had previously told CIT and the Marshall Defendants.  Neither CIT nor the Marshall Defendants disclosed the appraisal or its contents to FCL, however, because they wanted to cover up both their prior fraudulent conduct and the substantial credit risks facing FCL as a participant in the Lease financing.

80.     In addition to concealing the appraisal from FCL, CIT and the Marshall Defendants participated in a scheme to pay kickbacks to Le-Nature's using the excess financing provided by FCL and the other participating investors.

81.     Prior to FCL's execution of the Participation Agreement, Mr. Podlucky requested that CIT make the next required installment payment directly to Le-Nature's instead of Krones. Mr. Podlucky justified this unconventional, commercially unreasonable and ultimately illegal practice by explaining that Krones held several million dollars of Le-Nature's' money in deposits

and that if CIT paid any more to Krones, Krones would be over-funded and would not have sufficient incentive to provide the Equipment.

82.     CIT initially refused Podlucky's kickback request.  Shortly after FCL closed on its purchase of a participation interest in the financing, however, CIT reversed course and agreed to make kickback payments to Le-Nature's under a modified, more indirect scheme.

83.     On or about April 29, 2005, CIT received a document executed by Mr. Podlucky (Le-Nature's) and Mr. Sommer (Krones) which provided that certain of CIT's payments to Krones for the purchase of the Equipment would include amounts owed to Le-Nature's as a refund for the purported deposits that the Krones Defendants allegedly held (the "Kickback Agreement").

84.     Although CIT was not a party to this Kickback Agreement, CIT consented in writing to send the "excess" (kickback) payments to Krones for the benefit of Le-Nature's.  For example, on May 6, 2005, Buzz Carr of CIT stated in an e-mail to William Nazarkewich of Krones that:

> This wire is being allocated as follows:
>
> $4,286,738.00 — allocated to Installment 3, Line 2
>
> $394,457.00 — allocated to Installment 3, Line 4a
>
> $13,547,103.30 — allocated to Installment 2, Line 2.  This amount falls within the definition of Excess Payments contained in the Agreement between Le-Nature's and Krones dated April 26, 2005.

85.     The April 26, 2005 agreement referenced in the May 6, 2005 e-mail is the Kickback Agreement.  By this e-mail, therefore, CIT acknowledged and agreed that over $13.5 million of the $18 million it was sending to the Krones Defendants (approximately 75% of the total wired monies) were "excess" payments (kickbacks) that the Krones Defendants were to funnel directly to Le-Nature's and Mr. Podlucky under the Kickback Agreement.

86.     When the "excess" payment was reduced to approximately $8.5 million (slightly less that 50% of the total wired monies) in a subsequent communication, CIT continued with the charade of "allocat[ing]" the monies to "Installment 2, Line 2" of the Equipment, when it was in fact bypassing "Line 2"and going straight to Mr. Podlucky and Le-Nature's under the Kickback Agreement.

87.     Three days later, CIT forwarded another $10.8 million to the Krones Defendants, but this time designated the entire amount to "excess" payments.  CIT did so despite "allocating" this funding to Installment 1 on Line 2 of the Equipment "[i]n order to clarify [its] recordkeeping."  In doing so, CIT acknowledged that in making the payment, it and the Krones Defendants were concealing the true nature of the kickback payments on their books as payments for the Equipment.

88.     Neither CIT nor the Krones Defendants made payments to Le-Nature's under the Kickback Agreement using their own funds.  Instead, they made the "excess" payments using the funds provided by FCL and the other participants in the Lease financing.

89.     Such "excess" payment arrangements are outside industry norms and viewed as commercially unreasonable in the equipment leasing industry.  Equipment financing is determined by, and limited to, the actual cost of the equipment being manufactured.  It is incredible and unprecedented that an equipment financier/lessor would make an unsecured loan to the lessee by simply inflating the price of manufactured equipment via an equipment financing transaction.

90.     FCL was not informed of this highly unusual, unreasonable, improper and dishonest arrangement.  Instead CIT and the Marshall Defendants led FCL to believe that all of its funds were being paid to the Krones Defendants in payment for the Equipment.

**J.      CIT And Marshall Cover Up Le-Nature's' Late Rental Payments**

91.      CIT's and the Marshall Defendants' intentional wrongdoing did not end with their suppression of the appraisal and participation in the Kickback Agreement.  In addition to these wrongful actions, CIT and the Marshall Defendants also covered up delinquent payments from Le-Nature's to avoid further scrutiny by FCL and the other participants in the financing.

92.      From the outset, Le-Nature's' rent payments were late.  Le-Nature's' inability or unwillingness to make timely lease payments constituted material and materially negative information that would not only send up a red flag to any potential creditor.  More importantly, CIT and the Marshall Defendants were duty bound to disclose to FCL and the other participants all this known negative information.

93.      Instead of collecting the rents and appropriate late fees, or disclosing Le-Nature's late payments to the participants, CIT and the Marshall Defendants covered up Le-Nature's' failings by paying the late fees themselves.

94.      In addition, although CIT and the Marshall Defendants represented in the Information Memorandum that their fees for the transaction would be paid from Le-Nature's' monthly rent payments, they, without FCL's knowledge, collected the fees directly from FCL's and the other participants' investments.  Between CIT and Marshall, these fees totaled roughly $3.75 million ($2.36 million for CIT and $1.36 million for Marshall).

95.      Neither CIT nor the Marshall Defendants disclosed the source of these payments to FCL.  This arrangement is contrary to industry practice and, had it been disclosed, would have been yet another red flag to FCL that something was wrong.

**K.     The Fraud Of Le-Nature, The Krones Defendants, CIT And The Marshall Defendants Is Exposed**

96.     On November 1, 2006, a group of unsecured creditors forced Le-Nature's into an involuntary bankruptcy.  The bankruptcy followed the public revelation that Le-Nature's had committed yet another massive fraud whereby it grossly inflated its sales to be over $275 million annually when, in reality, Le-Nature's' sales were only $32 million.  The enormous overstatement of Le-Nature's' revenues, and the resultant false profit reports went back for years.

97.     Following the bankruptcy and Le-Nature's' inevitable default under the Lease, CIT took possession of the Equipment.  After several months of marketing, the same Equipment CIT, the Marshall Defendants, the Krones Defendants and Le-Nature's misrepresented to FCL and the other participants as worth $145 million just two years earlier, was sold for roughly $22 million.

<u>**COUNT I - FRAUD**</u>

**Farm Credit Leasing Services Corporation v. CIT**

98.     FCL repeats and realleges all prior allegations.

99.     As fully explained above, CIT was aware of material information and failed to disclose such material information to FCL.  The suppressed information included, without limitation, the following:

(a)     the true financial condition, operations, procedures and sales of Le-Nature's;

(b)     the existence of a Whistleblower and his statements; and

(c)     the fact that the Whistleblower's statements were directly and indirectly contrary to the statements and assurances by CIT and relating to:

(1)     the value of the Equipment;

> (2)    the liquidation value and the market for resale of the Equipment;
>
> (3)    the level of risk present in the transaction because of the inability to liquidate the Equipment and retain reasonable return value;
>
> (4)    the problems with the Lease, Le-Nature's, Krones and Krones AG;

(d)    the kickback demands;

(e)    the true reasons for Varilease's withdrawal; and

(f)    the additional demands that CIT made for deposits and a security lien on line of the Equipment after the Whistleblower's revelations.

100.    CIT owed a duty to FCL to disclose such material information because of, among other reasons:

> (a)    its superior knowledge that FCL could not have obtained in the exercise of reasonable care and due diligence;
>
> (b)    its superior position to obtain such information (for instance, the Whistleblower allegations -- something that FCL could not have discovered);
>
> (c)    the relation of the parties;
>
> (d)    CIT limited FCL from directly communicating with Le-Nature's and the Krones Defendants; and
>
> (e)    CIT specifically undertook a duty by promising in the Participation Agreement to provide FCL "on a timely basis" "all information" "to enable [FCL] to make" appropriate "analysis and decisions."

101.    Moreover, CIT made partial representations/disclosures that misled FCL as fully detailed throughout this Complaint, and which allegations are incorporated as if set forth fully

herein.  Once CIT made such partial representations, it was under a duty to provide all material information so that there would be a full and fair disclosure.  For instance, CIT had the duty to inform FCL of, or alternatively had the duty to correct the assurances, false statements and partial disclosures regarding, among other things:  (i) the value of the Equipment, (ii) the liquidation value and the market for resale of the Equipment, (iii) CIT's alleged expertise in administering and arranging equipment leases, (iv) the risk of the transaction because of the inability to liquidate the Equipment and retain reasonable value, and (v) that there were no clear problems with the Lease, Le-Nature's, Krones, Krones AG or the value of the Equipment.

102.    CIT failed in its duty to disclose to FCL material information for the purpose of inducing FCL to enter into the Participation Agreement.

103.    The above-described suppressed and misrepresented information was material and FCL reasonably relied upon it (or upon the absence of it).  CIT intentionally and in bad faith suppressed or misrepresented such facts.

104.    As a result, FCL has suffered and continues to suffer a loss in the form of monetary damages.

105.    The suppression and misrepresentation by CIT constitutes fraud.

106.    FCL is entitled to punitive damages as a result of the repeated, willful, intentional and malicious suppressions and misrepresentations specified above.

WHEREFORE, FCL demands compensatory and punitive damages and judgment against CIT in the amount a jury deems just and proper, plus interest, expenses and costs.  In the alternative, FCL demands rescission of the Participation Agreement and the return of all money advanced by FCL relating to same.

## COUNT II – NEGLIGENT MISREPRESENTATION

### Farm Credit Leasing Services Corporation v. CIT

107.    FCL repeats and realleges all prior allegations.

108.    As fully explained above, CIT was aware of material information and failed to disclose such material information to FCL.  The suppressed information included, without limitation, the following:

    (a)    the true financial condition, operations, procedures and sales of Le-Nature's;

    (b)    the existence of a Whistleblower and his statements; and

    (c)    the fact that the Whistleblower's statements were directly and indirectly contrary to the statements and assurances by CIT and relating to:

        (1)    the value of the Equipment;

        (2)    the liquidation value and the market for resale of the Equipment;

        (3)    the level of risk present in the transaction because of the inability to liquidate the Equipment and retain reasonable return value;

        (4)    the problems with the Lease, Le-Nature's, Krones and Krones AG;

    (d)    the kickback demands;

    (e)    the true reasons for Varilease's withdrawal; and

    (f)    the additional demands that CIT made for deposits and security lien on a line of the Equipment after the Whistleblower's revelations.

109.    CIT owed a duty to FCL to disclose such material information to FCL because of, among other reasons:

    (a)    its superior knowledge that FCL could not have obtained in the exercise of reasonable care and due diligence;

(b)     its superior position to obtain such information (for instance, the
        Whistleblower allegations -- something that FCL could not have
        discovered);

(c)     the relation of the parties;

(d)     CIT limited FCL from directly communicating with Le-Nature's; and

(e)     CIT specifically undertook a duty by promising in the Participation
        Agreement to provide FCL "on a timely basis" "all information" "to
        enable [FCL] to make" appropriate "analysis and decisions."

110.    Moreover, CIT made partial representations/disclosures that misled FCL as fully
detailed throughout this Complaint, and which allegations are incorporated as if set forth fully
herein.  Once CIT made such partial representations, it was under a duty to provide all material
information so that there would be a full and fair disclosure.  For instance, CIT had the duty to
inform FCL of, or alternatively had the duty to correct the assurances, false statements and
partial disclosures regarding, among other things:  (i) the value of the Equipment, (ii) the
liquidation value and the market for resale of the Equipment, (iii) CIT's alleged expertise in
administering and arranging equipment leases, (iv) the risk of the transaction because of the
inability to liquidate the Equipment and retain reasonable value, and (v) that there were no clear
problems with the Lease, Le-Nature's, Krones, Krones AG or the value of the Equipment.

111.    CIT, exercising ordinary and reasonable care, should have communicated such
material information to FCL before FCL closed on the purchase of a participation interest so as
to give FCL a full and fair opportunity to review this information as part of FCL's underwriting
process.

112.    CIT was negligent in its breach of its duties.

113.    As a result, FCL has suffered and continues to suffer a loss in the form of monetary damages.

WHEREFORE, FCL demands compensatory and punitive damages and judgment against CIT in the amount a jury deems just and proper, plus interest, expenses and costs.

## COUNT III – AIDING AND ABETTING FRAUD

### Farm Credit Leasing Services Corporation v. CIT

114.    FCL represents and realleges all prior allegations.

115.    Le-Nature's committed a fraud on all its lenders, including FCL, as described in this Complaint.

116.    As set forth in Counts I and II above, CIT committed a tortious act in concert with Le-Nature's pursuant to a common design with Le-Nature's.

117.    CIT knew that Le-Nature's conduct constituted a breach of duty and CIT gave substantial assistance to Le-Nature's.

118.    As a result, FCL has suffered and continues to suffer a loss in the form of monetary damages.

WHEREFORE, FCL demands compensatory and punitive damages and judgment against CIT in the amount a jury deems just and proper, plus interest, expenses and costs.

## COUNT IV – BREACH OF CONTRACT

### Farm Credit Leasing Services Corporation v. CIT

119.    FCL repeats and realleges all prior allegations.

120.    FCL entered into a multi-year contract, the Participation Agreement, with CIT.

121.    As described above, CIT failed to comply with the required provisions of the Participation Agreement.  For instance, CIT agreed to provide FCL prompt written notice of the occurrence of any event of default under the Lease that CIT received.

122.     CIT further agreed that it would not consent to a reduction, waiver or release of any of Le-Nature's payment obligations under the Lease, including but not limited to extending the time of payment of any of Le-Nature's obligations under the Lease.

123.     CIT also represented and warranted to FCL that as of April 15, 2005, it had no actual knowledge that any default had occurred under the Lease.

124.     In addition, CIT warranted to FCL that it would exercise the same duty of care in its administration of the Lease with respect to FCL as CIT normally exercises in managing its own affairs.

125.     CIT's representations were false and CIT failed to perform its duties under the Participation Agreement.

126.     As a result, FCL has suffered and continues to suffer a loss in the form of monetary damages.

WHEREFORE, FCL demands compensatory damages and judgment against CIT in the amount a jury deems just and proper, plus interest, expenses and costs.

## COUNT V - CIVIL RICO -- VIOLATION OF 18 U.S.C. § 1962(C)

### Farm Credit Leasing Services Corporation v. All Defendants

127.     FCL repeats and realleges all prior allegations.

128.     FCL is a "person" within the meaning of 18 U.S.C. § 1961(3).

129.     Defendants are each "persons" within the meaning of 18 U.S.C. § 1961(3).

130.     Krones, Krones AG and their employees (including Kronseder and Sommer), together with Le-Nature's and Gregory Podlucky, are a group of corporations and individuals associated in fact so as to form an "enterprise" for the purpose of defrauding various victims and for other illicit purposes (hereinafter "the Le-Nature's Enterprise") within the meaning of 18

U.S.C. § 1961(4). CIT and the Marshall Defendants provided substantial assistance to the Le-Nature's Enterprise in achieving its fraudulent aims.

131. The Le-Nature's Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

132. The Krones Defendants and their employees participated directly or indirectly, in the conduct of the affairs of the Le-Nature's Enterprise through a pattern of racketeering activity (within the meaning of 18 U.S.C. § 1961(5)) as described herein, in violation of 18 U.S.C. § 1962(c).

133. The Krones Defendants (and their employees) conducted and participated in the affairs of the Le-Nature's Enterprise in order to carry out a pattern of racketeering with three illegal aims:

(a) to fraudulently obtain money by committing various frauds;

(b) to defraud FCL, the other participants and others in order to unlawfully enrich themselves; and

(c) to corruptly conceal the racketeering activity by filing false documents and providing such false documents to FCL and others.

134. Unbeknownst to their victims, Le-Nature's, the Krones Defendants, CIT and the Marshall Defendants provided false and misleading information regarding the purchase price of the bottling Equipment. With regard to the Phoenix Facility, FCL and other financial institutions were told orally and in writing that the purchase price for all of the bottling Equipment was in excess of $180 million. In fact, the true purchase price negotiated between Le-Nature's and the Krones Defendants, which price was made known to CIT and the Marshall Defendants but kept secret from FCL and the other participants, was approximately $90 million.

135.     In addition, Le-Nature's and the Krones Defendants planned to repeat this equipment financing for another bottling facility to be located in the southeast in mid 2006. Likewise, the Defendants told other financial institutions that the purchase price for the Equipment was substantially higher than the true purchase price.  With regard to the Phoenix Facility and planned southeast facility the participants and other financial institutions were harmed in amounts in excess of approximately $120 million.

136.     Le-Nature's' fraudulent operation was funded, in large part, by tens of millions of dollars it illegally obtained through its kickback scheme. These funds enabled Le-Nature's to create the illusion of a legitimate business.

137.     Le-Nature's used the kickback funds to stay ahead of its expenses, which were greater than its revenues.  Thus, the kickbacks were necessary in order to make payroll and other overhead expenses.  Without the kickbacks, Le-Nature's' financial troubles would have been revealed much earlier and it never would have been able to obtain financing from investors/lenders like FCL.

138.     The kickback scheme also enabled Le-Nature's' to manipulate its financial statements.  Le-Nature's used the fraudulent kickback payments to offset falsely reported revenues.  The deposits, however, could not accumulate unabated to match the full revenue overstatement.  Le-Nature's, therefore, used the kickbacks from the Krones Defendants to reduce the reported level of deposits, thereby enabling Le-Nature's to report more false revenues and to further fabricate deposits as offsets to balance Le-Nature's' false account statements.  In this manner, the kickbacks from the Krones Defendants were a critical component in Le-Nature's' overstatement of revenues, and resulting overstatements of income and shareholder equity.

These inflated amounts in turn enabled Le-Nature's to continue borrowing money, thereby further perpetuating its fraudulent existence.

139.    Upon information and belief, the Krones Defendants received wires from the various participants totaling $227.5 million, but made fourteen fraudulent kickback payments to Le-Nature's totaling approximately $118.3 million.

140.    By so doing, with the knowing and substantial assistance of CIT and the Marshall Defendants, the Krones Defendants kicked back to Le-Nature's more than half of the total amount it took from the participants, while still keeping a profit for itself.

141.    The racketeering activity of the Le-Nature's Enterprise included, but was not limited to, the use of interstate mails and wires for the purpose of executing a scheme to obtain money or property by means of false pretenses, representations, or promises.  The racketeering activity thus constitutes multiple, related acts that are indictable under the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and is within the scope of 18 U.S.C. § 1961(1)(B) and (5).

142.    The Marshall Defendants, CIT and others not named herein, provided knowing and substantial assistance to Le-Nature's and the Krones Defendants in the commission of two or more of these acts of racketeering activity and are, therefore, responsible for aiding and abetting the wrongdoing.  Without such material assistance, the Le-Nature's Enterprise would not have been successful.

143.    Each of the following mailings and interstate wire communications constitute a separate act of racketeering and were all undertaken with the specific intent to be part of and in furtherance of the frauds perpetrated upon FCL and the other Participants:

Early 2005                        CIT and the Marshall Defendants distributed to FCL, via United
                                  States mails and/or electronic mail, a "Frequently Asked

|  | Questions" Memorandum which misrepresented Marshall's financial commitment and the amount of deposits. |
|---|---|
| Early 2005 | CIT and the Marshall Defendants provided to FCL, via United States mails and/or electronic mail, a preliminary analysis of the residual risk associated with the Equipment which misrepresented the Equipment's liquidation value. |
| January - April, 2005 | Employees and representatives of CIT, including Brad Leibold, and the Marshall Defendants, conducted conference calls via telephone with FCL and other participants in which they provided false information regarding the Equipment transaction. |
| February 3, 2005 | The Krones Defendants and Le-Nature's transferred by wire communications approximately $11 million from an account controlled by the Krones Defendants to an account maintained at S&T Bank, in Indiana, Pa., instead of using such funds for the purchase and manufacture of the Equipment. |
| April - September 2005 | CIT wired approximately $100 million to the Krones Defendants. |
| April 15 - 20, 2005 | CIT received by wire transfer approximately $24 million from participants and in turn wired approximately $7 million to the Krones Defendants for the purchase of the Equipment. |
| April 29, 2005 | CIT received by wire transfer approximately $6 million from the participants and in turn wired approximately $11 million to the Krones Defendants for the purchase of the Equipment. |
| May 6, 2005 | CIT received by wire transfer approximately $12 million from the participants and in turn wired approximately $18 million to the Krones Defendants for the purchase of the Equipment. |
| May 13, 2005 | CIT received by wire transfer approximately $4 million from the participants and in turn wired approximately $7 million to the Krones Defendants for the purchase of the Equipment. |
| May 26, 2005 | CIT received by wire transfer approximately $4 million from the participants and in turn wired approximately $7 million to the Krones Defendants for the purchase of the Equipment. |
| June 22, 2005 | CIT received by wire transfer approximately $19 million from the participants and in turn wired approximately $19 million to the Krones Defendants for the purchase of the Equipment. |

| | |
|---|---|
| July 27, 2005 | CIT received by wire transfer approximately $16 million from the participants and in turn wired approximately $16 million to the Krones Defendants for the purchase of the Equipment. |
| August 5, 2005 | CIT received by wire transfer approximately $15 million from the participants and in turn wired approximately $15 million to the Krones Defendants for the purchase of the Equipment. |
| August 2005 - October 2006 | Via electronic mail, Le-Nature's sent documentation required under the Closing Documents to CIT, including Le-Nature's purported quarterly statements. |
| March 21 - 22, 2005 | Via facsimile to Mr. Magrath, Mr. Podlucky of Le-Nature's sent a specification sheet ostensibly identifying each piece of Equipment for line 1, showing a total cost of approximately $46.1 million. |
| March 24, 2005 | Kronseder of Krones AG spoke by telephone with Roy Keller of CIT and stated that the value of Equipment already shipped to Krones was $100 million but that this amount reflected the inter-company price and not the price Krones would charge CIT. |
| March 24, 2005 | The Krones Defendants wired to Le-Nature's portions of an $11.6 down payment totaling approximately $5 million. The funds were originally wired from CIT to the Krones Defendants. |
| March 24, 2005 | Sommer of Krones spoke with CIT by telephone and stated that: (1) the total price of the Equipment was $185 million; (2) the price of the Equipment included a "markup" over the amount Krones is invoiced by Krones AG; (3) he had been in Podlucky's office during the March 22 telephone call; (4) he had helped compile the specification sheets provided to CIT; (5) Podlucky's statements that this was the first time specification sheets were prepared was accurate; (6) Krones had received an $11.5 million down payment from Le-Nature's; and (7) Krones had not paid any funds received for the Leased Equipment back to Le-Nature's. |
| March 28, 2005 | Via facsimile to CIT, Podlucky sent specification sheets for all four bottling lines, ostensibly identifying each piece of Equipment and the corresponding purchase price being charged by Krones, which according to the sheets, were consistent with the purchase price of the PMA. The sheets were signed by Podlucky, and Rainulf Diepold of Krones. |

| | |
|---|---|
| March 28, 2005 | Via letter from Sommer of Krones to Keller of CIT, Sommer claimed that the information provided on the Whistleblower's spreadsheet was actually information for a different bottling project than the Arizona project. |
| April 15 - August 5, 2005 | Via United States mails and/or wire, CIT periodically received draw request certificates and Krones' invoices requesting that CIT make installment payments to the Krones Defendants for the Equipment. Collectively, the draw requests totaled approximately $100 million. |
| April 29, 2005 | Via United States mails and/or wire, Le-Nature's and the Krones Defendants presented CIT with the Kickback Agreement, directing CIT to indicate which portions of future payments under the PMA constituted "excess" funds.  Consistent with this Kickback Agreement, each subsequent wire transfer of payments was accompanied with a letter identifying the "excess" funds.  These "excess" funds were remitted by the Krones Defendants to Le-Nature's. The total amount of such remittances was approximately $60 million. |
| December 29, 2005 - February 3, 2006 | The Krones Defendants paid to Le-Nature's via wire transfer or U.S. Mail approximately $10 million of the $26 million "excess" payments. |

144.    This racketeering activity constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  The racketeering activity was continuous and related.

145.    The predicate acts of racketeering activity are related to the same or similar purposes, results and participants, and have the same goals, namely the enrichment of the Defendants at the expense of FCL, the other participants and others, and have the same methods of commission and are otherwise inter-related by distinguishing characteristics, and are not isolated incidents.

146.    The pattern of racketeering activity was sufficiently continuous under either the closed-end or open-ended continuity standards.  As for closed-end continuity, the racketeering activity began in or about 2004 and lasted until exposed in or about 2006.  The racketeering

activity was a regular way for the Krones Defendants and the Le-Nature's Enterprise to conduct business.  Moreover, the racketeering activity was a regular way for the Defendants and the Le-Nature's Enterprise to conduct business.  Moreover, the racketeering activity would have continued unabated had the activities not been exposed, satisfying the open-end standard.

147.   FCL has been directly and proximately caused injury and financial loss by reason of the Defendants' violation of 18 U.S.C. § 1962(c).

WHEREFORE, FCL prays for the following relief:

(a)   A judgment against Krones and Krones AG, jointly and severally, for the full amount of compensatory and punitive damages proven at trial, restitution, disgorgement of profits, treble damages, plus all pre-judgment and post-judgment interest allowed by law until the judgment is paid in full;

(b)   A judgment against CIT and the Marshall Defendants, jointly and severally, for aiding and abetting the RICO violation committed by Krones and Krones AG, for the full amount of compensatory and punitive damages proven at trial, restitution, disgorgement of profits, treble damages, plus all pre-judgment and post-judgment interest allowed by law until the judgment is paid in full;

(c)   A judgment against the Defendants, jointly and severally, for the costs, attorney's fees and other expenses incurred in this action; and

(d)   Such other relief as the Court deems proper.

## COUNT VI — CIVIL RICO FOR VIOLATION OF 18 U.S.C. § 1962(C)

### Farm Credit Leasing Services Corporation v. All Defendants

148.   FCL repeats and realleges all prior allegations.

149.     The Krones Defendants and their employees (including Kronseder and Sommer), together with CIT and the Marshall Defendants, are a group of corporations and individuals associated in fact so as to form an "enterprise" for the purpose of defrauding various victims and for other illicit purposes (hereinafter "the CIT Enterprise") within the meaning of 18 U.S.C. § 1961(4).

150.     The CIT Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

151.     The Krones Defendants and their employees, along with CIT and the Marshall Defendants, participated directly or indirectly, in the conduct of the affairs of the CIT Enterprise through a pattern of racketeering activity (within the meaning of 18 U.S.C. § 1961(5)) as described herein, in violation of 18 U.S.C. § 1962(c).

152.     Krones, Krones AG (and their employees), CIT and the Marshall Defendants conducted and participated in the affairs of the CIT Enterprise in order to carry out a pattern of racketeering with three illegal aims:

(a)     to fraudulently obtain money by committing various frauds;

(b)     to defraud FCL, the other participants and others in order to unlawfully enrich themselves; and

(c)     to corruptly conceal the racketeering activity by filing false documents and providing such false documents to FCL and others.

153.     Unbeknownst to their victims, the Krones Defendants, CIT and the Marshall Defendants provided false and misleading information regarding the purchase price of the Equipment.  With regard to the Phoenix Facility, FCL and other financial institutions were told orally and in writing that the purchase price for all of the Equipment was in excess of $180

million.  In fact, the true purchase price negotiated between Le-Nature's and the Krones

Defendants, which price was made known to CIT and the Marshall Defendants but kept secret

from FCL and the other participants, was approximately $90 million.

154.    Similarly, with regard to Le-Nature's' planned southeast facility, the Defendants

told other financial institutions that the purchase price for the Equipment was substantially

higher than the true purchase price.  With regard to the Phoenix Facility and the planned

southeast facility the participants and other financial institutions were harmed in amounts in

excess of approximately $120 million.

155.    CIT and the Marshall Defendants worked very closely with the Krones

Defendants in continuing to provide funding for Le-Nature's by deceiving and concealing critical

information from FCL and the other victims.

156.    CIT, in a Complaint filed in the District Court for the District of Arizona in

October, 2008, acknowledged the collaborative relationship.  CIT explains that even Le-Nature's

knew it "was engaged in a national effort to sell participation interests."  CIT also describes

personal meetings between the Krones Defendants' representatives, as well as Sommer and

Kronseder, and CIT to "facilitate CIT's purchase and financing of the … Equipment."  CIT also

highlighted a Chicago dinner that included "several senior executives of CIT, Le-Nature's and

Krones" to discuss "CIT's efforts to finance the purchase of the… Equipment through selling

participant interests to financial institutions."  The Chicago dinner was also to "honor Podlucky

and Le-Nature's."

157.    The racketeering activity of the CIT Enterprise included, without limitation, the

use of interstate mails and wires for the purpose of executing a scheme to obtain money or

property by means of false pretenses, representations, or promises.  The racketeering activity

thus constitutes multiple, related acts that are indictable under the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 (as alleged in Paragraph 143 above), and is within the scope of 18 U.S.C. § 1961(1)(B) and (5).

158.    Each of the Defendants either committed at least two of these acts of racketeering or provided knowing substantial assistance thereto (creating liability by aiding and abetting). Each mailing and interstate wire communication constitutes a separate act of racketeering and each was undertaken with the specific intent to be part of and in furtherance of the frauds perpetrated upon FCL and other participants.

159.    The racketeering activity constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The racketeering activity alleged was both related and continuous.

160.    The predicate acts of racketeering activity are related to the same or similar purposes, results and participants, and have the same goals, namely the enrichment of the Defendants at the expense of FCL, the other participants and others, and have the same methods of commission and are otherwise inter-related by distinguishing characteristics, and are not isolated incidents.

161.    The pattern of racketeering activity was sufficiently continuous under either the closed-end or open-ended continuity standards.  As for closed-ended continuity, the racketeering activity began in or about 2004 and lasted until exposed in or about 2006.  The racketeering activity would have continued unabated had the activities not been exposed, satisfying the open-ended standard.

162.    FCL has been directly and proximately caused injury and financial loss by reason of the Defendants' violation of 18 U.S.C. § 1962(c).

WHEREFORE, FCL prays for the following relief:

(a)     A judgment against the Defendants, jointly and severally, for the full amount of compensatory and punitive damages proven at trial, restitution, disgorgement of profits, treble damages, plus all pre-judgment and post-judgment interest allowed by law until the judgment is paid in full;

(b)     A judgment against the Defendants, jointly and severally, for the costs, attorney's fees and other expenses incurred in this action; and

(c)     Such other relief as the Court deems proper.

## COUNT VII — CIVIL RICO FOR VIOLATION OF 18 U.S.C. § 1962(D)

### Farm Credit Leasing Services Corporation v. All Defendants

163.    FCL repeats and realleges all prior allegations.

164.    For purposes of this claim, the Le-Nature's Enterprise as described above and the CIT Enterprise as described above are, in the alternative, RICO association-in-fact enterprises within the meaning of 18 U.S.C. § 1961(4).

165.    The Le-Nature's Enterprise and The CIT Enterprise were each engaged in and affected interstate and foreign commerce.

166.    As set forth above, the Krones Defendants and their employees, along with CIT and the Marshall Defendants, participated directly and indirectly, in the conduct of the affairs of the Le-Nature's Enterprise through a pattern of racketeering activity (within the meaning of 18 U.S.C. § 1961(5)) as described herein, in violation of 18 U.S.C. § 1962(c).

167.    As set forth above, the Krones Defendants and their employees, along with CIT and the Marshall Defendants, participated directly or indirectly, in the conduct of the affairs of

the CIT Enterprise through a pattern of racketeering activity (within the meaning of 18 U.S.C. § 1961(5)) as described herein, in violation of 18 U.S.C. § 1962(c).

168.     Each of the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of either the Le-Nature's Enterprise or the CIT Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

169.     The Defendants manifested and/or reached agreement to commit, and indeed committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including, without limitation, the acts set forth in paragraph 143 above.

170.     Absent Defendants' conspiracy and joint efforts, the fraudulent RICO enterprises would not have been successful.

171.     FCL has been directly and proximately injured and suffered financial loss by reason of the Defendants' violation of 18 U.S.C. § 1962(d).

WHEREFORE, FCL prays for the following relief:

(a)  A judgment against the Defendants, jointly and severally, for the full amount of compensatory and punitive damages proven at trial, restitution, disgorgement of profits, treble damages, plus all pre-judgment and post-judgment interest allowed by law until the judgment is paid in full;

(b) A judgment against the Defendants, jointly and severally, for the costs, attorney's fees and other expenses incurred in this action; and

(c) Such other relief as the Court deems proper.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, FCL hereby demands a trial by jury on all issues.

Dated:  October 29, 2010

**BUCHANAN INGERSOLL & ROONEY PC**

  /s/ Timothy P. Palmer
Timothy P. Palmer, Esquire
PA I.D. No. 86165
Christopher P. Schueller, Esquire
PA I.D. No. 92746
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA  15219
(412) 562-8800

H. Marc Tepper, Esquire
PA I.D. No. 49084
Two Liberty Place
50 South 16th Street, Suite 3200
Philadelphia, PA 19102
(215) 665-8700

*Attorneys for Plaintiff*
*Farm Credit Leasing Services Corporation*

#2776371-v13